**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JOANN THOMPSON, | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | Civil Action No.: | 13-0214 (RC) |
| v. | : | | |
| | : | Re Document No.: | 34 |
| ROBERT A. MCDONALD, | : | | |
| *Secretary of Veterans Affairs*, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Joann Thompson is an employee of the Readjustment Counseling Service of the United States Department of Veterans Affairs (VA). After Ms. Thompson's supervisor chose a younger white male instead of herself for promotion, she sued the VA through its Secretary.[1] Ms. Thompson brought race, sex, and age discrimination claims, as well as retaliation claims, under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967 (ADEA).

Because Ms. Thompson seeks voluntary dismissal of her retaliation claims, the Court will dismiss those claims. And because no reasonable juror could find that the VA intentionally

---

[1] Although Ms. Thompson's complaint named Eric Shinseki as Defendant, *see* Compl., ECF No. 1, Secretary McDonald is substituted for Mr. Shinseki under Federal Rule of Civil Procedure 25(d).

discriminated against Ms. Thompson on the basis of race, sex, or age, the Court will grant the government's motion for summary judgment.[2]

## II.  BACKGROUND

### A.  The Readjustment Counseling Service

The Readjustment Counseling Service is a division of the Veterans Health Administration within the United States Department of Veterans Affairs (VA). *See* 38 U.S.C. § 7309(a). The Service provides counseling to veterans readjusting to civilian life and to family members of military personnel. *See id.* § 1712A. Within the Service, "Vet Centers" are small units of three to five staff members, which may include social workers, clinical psychologists, clinical nurses, counseling therapists, and administrative staff members. *See* Def.'s Statement of Material Facts ¶ 9, ECF No. 36 [hereinafter Def.'s Statement]; Pl.'s Statement of Material Facts ¶ 9, ECF No. 40-1 [hereinafter Pl.'s Statement]. A Team Leader directs each Vet Center and supervises the Vet Center's staff. *See* Pl.'s Ex. B, ¶ 4.02.a–b, ECF No. 40-3 (discussing Team Leaders). The Service uses Vet Centers as a principal means of delivering its counseling services. *See* Pl.'s Ex. B, ¶ 4.04.a, ECF No. 40-3 (discussing Vet Centers and their role).

The Service has a Chief Officer who is its national director and who has oversight of all the Vet Centers nationwide. 38 U.S.C. § 7309(b), (c)(3). In 2009, the year of the events relevant to this case, Alfonso Batres was the Service's Chief Officer. *See* Luper Suppl. Decl. Ex. G, ECF No. 34-12 (displaying "Chief Officer" below Mr. Batres's name on the memorandum approving

---

[2] Because Ms. Thompson's ADEA claims are not triable by a jury, the Court's statements about reasonable jurors' potential findings also refer to potential findings of the Court as the factfinder in a bench trial. *See generally Lehman v. Nakshian*, 453 U.S. 156, 162–69 (1981) (concluding that "Congress did not depart from its normal practice of not providing a right to trial by jury" for claims against the United States when it enacted the ADEA).

Dale Willis's selection as Deputy Regional Manager, over Ms. Thompson); *see also* Thompson Dep. 19:14–21:20, ECF No. 34-4 (indicating that Mr. Batres was Chief Officer).

Under the Chief Officer, the Service subdivides into seven regions, each managed by a Regional Manager, who receives assistance from a Deputy Regional Manager. Def.'s Statement ¶ 5; Pl.'s Statement ¶ 5. In 2009, Region 1B of the Service encompassed thirty-two Vet Centers spanning eight states and the District of Columbia. Def.'s Statement ¶ 7; Pl.'s Statement ¶ 7; Willis Decl. ¶ 2, ECF No. 34-13. Terry Luper was Region 1B's Regional Manager in 2009. Luper Suppl. Decl. ¶ 1, ECF No. 34-11. When Mr. Luper became Regional Manager in 2008, he vacated his previous position as Region 1B's Deputy Regional Manager. Def.'s Statement ¶ 6; Pl.'s Statement ¶ 6.

## B.  Deputy Regional Manager Vacancy

In December 2008, Mr. Luper contacted the VA's human resources staff to begin the recruiting process for Region 1B's Deputy Regional Manager. Luper Suppl. Decl. ¶ 2; *see id.* Ex. A (reproducing Mr. Luper's memorandum to the VA's human resources staff). The VA accordingly released a vacancy announcement on January 22, 2009, with a closing date of February 13, 2009. Def.'s Statement ¶ 23; Pl.'s Statement ¶ 23; Def.'s Ex. 1, ECF No. 34-2 (reproducing the vacancy announcement). Mr. Luper was the selecting official for this vacancy. Thompson Decl. ¶ 68, ECF No. 34-8; *see also* Pl.'s Ex. T, ¶ 11.a, ECF No. 40-3 (indicating, in paragraphs under the heading "Selection," that the selecting official is the "Chief of the Service" by default, but noting that "[s]election may be made at a lower level of supervision when authority is specifically delegated"); Luper Suppl. Decl. Ex. G, ECF No. 34-12 (showing that Mr. Batres was the approving official, not the selecting official, for Dale Willis's selection as Deputy Regional Manager, over Ms. Thompson).

3

### C.  Deputy Regional Manager Candidates

After the vacancy announcement closed, Edna Lepe, a VA human resources employee, collected all the applications and assessed whether the candidates met the minimum qualifications for the Deputy Regional Manager position. Lepe Decl. ¶ 44, ECF No. 34-14. Although eight candidates applied for the position, only three met the job's minimum qualifications: Plaintiff Joann Thompson, Sharon Sprecher, and Dale Willis. *See* Def.'s Ex. 3, ECF No. 34-2; Pl.'s Ex. M, ECF No. 40-3. Ms. Lepe forwarded those three candidates' materials on to Mr. Luper for consideration. Def.'s Statement ¶ 32; Pl.'s Statement ¶ 32. Because he directly supervised all three candidates, Mr. Luper knew each of the three candidates well. Def.'s Statement ¶ 51; Pl.'s Statement ¶ 51.

### 1.  Joann Thompson

Plaintiff Joann Thompson is an African-American female. Def.'s Statement ¶ 1; Pl.'s Statement ¶ 1. In 2009, Ms. Thompson was fifty-seven years old. Def.'s Statement ¶ 2; Pl.'s Statement ¶ 2.

Ms. Thompson applied for the Deputy Regional Manager position on February 13, 2009. Def.'s Statement ¶ 28; Pl.'s Statement ¶ 28. At the time, she worked in the Readjustment Counseling Service as a Team Leader for the Vet Center in Washington, D.C. Def.'s Statement ¶ 8; Pl.'s Statement ¶ 8. In that capacity, Ms. Thompson supervised two other counselors and a small staff. Def.'s Statement ¶ 12; Pl.'s Statement ¶ 12. She also exercised responsibility for the Vet Center's overall operations, evaluated her staff's performance, defined the Vet Center's mission and scope, and provided outreach to other VA branches. Pl.'s Counter-Statement of Material Facts ¶ 5, ECF No. 40-1 [hereinafter Pl.'s Counter-Statement]; Def.'s Reply to Pl.'s Counter-Statement ¶ 5, ECF No. 44-2 [hereinafter Def.'s Reply Statement].

2.  Dale Willis

Dale Willis is a white male. Compl. ¶ 15, ECF No. 1; Answer ¶ 15, ECF No. 10. The

VA's human resources staff received Mr. Willis's application on February 10, 2009. *See* Luper

Suppl. Decl. Ex. G, ECF 34-12 (reproducing Mr. Willis's application, which bears a stamp

showing it was received on February 10, 2009). Mr. Willis was in his early forties at the time.

Compl. ¶ 15; Pl.'s Counter-Statement ¶ 23; *see also* Luper Decl. ¶ 50, ECF No. 34-10 (indicating

that Mr. Willis was forty-four around the time of his application); Lepe Decl. ¶ 47 (noting that

Mr. Willis's date of birth is in 1965).

When he applied to be Deputy Regional Manager, Mr. Willis was one of Region 1B's

two Associate Regional Managers for Counseling. Def.'s Statement ¶ 13; Pl.'s Statement ¶ 13;

Pl.'s Ex. D, ECF No. 40-3 (showing that Mr. Willis was one of two people who had the job title

"ARM/Counseling"). In that role, Mr. Willis was "charged with clinical oversight of all Vet

Centers in the Region." Pl.'s Ex. C, ¶ 1, ECF No. 40-3; *accord* Def.'s Statement ¶ 16. Mr. Willis

conducted annual Vet Center site visits to provide consultation, clinical inspection, and quality

review. Def.'s Statement ¶ 17; Pl.'s Statement ¶ 17. "[T]hese quality assurance activities

extend[ed] to the assessment, training, supervision and guidance of vet center clinical staff." Pl.'s

Ex. C, ¶ 1; *accord* Def.'s Statement ¶¶ 16–19.

At the time of his application, however, Mr. Willis was deployed in the Middle East as a

captain in his Pennsylvania Army Reserve Component Unit. *See* Suppl. Luper Ex. G, ECF

No. 34-12 (noting Mr. Willis's status in the cover memorandum, and reproducing Mr. Willis's

military orders in an attachment); *see also* Pl.'s Ex. F, ECF No. 40-3 (showing discussion of

Mr. Willis's status in emails between Mr. Luper and Mr. Willis). Mr. Willis received notice of

the Deputy Regional Manager vacancy announcement through Mr. Luper, who sent Mr. Willis a

copy of the announcement. *See* Pl.'s Ex. F. To submit his application, Mr. Willis emailed his

application materials to Mr. Luper, who agreed to mail them to the VA's human resources staff.

*See id.*

### 3. Sharon Sprecher

Sharon Sprecher also applied to be Deputy Regional Manager. *See* Def.'s Statement ¶ 32;

Pl.'s Statement ¶ 32. At the time, Ms. Sprecher was an Associate Regional Manager for

Counseling in Region 1B, like Mr. Willis. Def.'s Statement ¶ 33; Pl.'s Statement ¶ 33; Pl.'s

Ex. D, ECF No. 40-3 (showing that Ms. Sprecher, like Mr. Willis, had the job title

"ARM/Counseling").

### D. Deputy Regional Manager Selection Process

Mr. Luper selected Mr. Willis to be Deputy Regional Manager. Def.'s Statement ¶ 50;

Thompson Decl. ¶ 87, ECF No. 34-8. According to Mr. Luper, the selection derived from a

process in which Mr. Luper reviewed the candidates' applications, interviewed the candidates,

and scored both the applications and the interviews. *See* Luper Suppl. Decl. ¶¶ 5–22, ECF

No. 34-11. Because Mr. Willis received the highest total score at the end of this process,

Mr. Luper chose him to be Deputy Regional Manager. *See id.* ¶¶ 21–22.

The three candidates' applications included each candidate's

(1)     resume or federal employment application form;
(2)     descriptions of experience and accomplishments related to the
        "knowledge, skills and abilities" (KSAs) listed on the Deputy Regional
        Manager vacancy announcement, *see* Def.'s Ex. 1, ECF No. 34-2; and
(3)     most recent performance appraisal.

*See* Def.'s Ex. 1, ECF No. 34-2 (describing, in sections titled "Basis for Rating" and "How to

Apply," how candidates should apply for the Deputy Regional Manager position); *see, e.g.*,

Def.'s Ex. 2, ECF No. 34-2 (reproducing Ms. Thompson's application); Luper Suppl. Decl.

Ex. G, ECF No. 34-12 (reproducing Mr. Willis's application).

Mr. Luper claims he conducted interviews of the applicants on the same day. Luper Suppl. Decl. ¶ 15; *see also id.* Ex. D, ECF No. 34-11 (showing that two of Mr. Luper's interview scoring sheets were dated March 23, 2009). At least for Ms. Thompson, Mr. Luper's interview took the form of a brief phone call. Pl.'s Counter-Statement ¶ 31. During the interviews, Mr. Luper asked each of the candidates the same five questions, which Mr. Luper developed based on the KSAs for the Deputy Regional Manager position. Luper Suppl. Decl. ¶ 15; *see id.* Ex. D (reproducing Mr. Luper's interview questions).

To select the Deputy Regional Manager, Mr. Luper used a scoring process that numerically evaluated

(1)    how well, based on the candidates' application packages and the Deputy Regional Manager position description, each candidate would fulfill the duties of the Deputy Regional Manager;

(2)    the candidates' descriptions of experience and accomplishments related to the KSAs for Deputy Regional Manager, *see* Def.'s Ex. 1, ECF No. 34-2;

(3)    the candidates' responses to the five interview questions;

(4)    the candidates' administrative experience; and

(5)    the candidates' veteran status.

*See id.* ¶¶ 6–20. For each item on the position description and each element of the KSAs, the candidates received one, three, or five points (five being most desirable). *See id.* ¶¶ 6–12; *see also id.* Exs. B–C, ECF No. 34-11 (reproducing Mr. Luper's scoring sheets for the items on the position description and the KSA elements). Likewise, Mr. Luper gave each candidate's response to each interview question a score between one and five. *See id.* ¶¶ 13–17; *see also id.* Ex. D, ECF No. 34-11 (reproducing Mr. Luper's scoring sheets for the candidates' interviews). Finally, each candidate received one, three, or five points for administrative experience, and zero or five points for the absence or presence of veteran status. *See id.* ¶¶ 18–20; *see also id.* Ex. E, ECF No. 34-11 (reproducing Mr. Luper's scoring sheet for administrative experience); *id.* Ex. F, ECF No. 34-12 (showing scores awarded for veteran status).

Under Mr. Luper's scoring system, Mr. Willis received 131 points in total, Ms. Sprecher received 119, and Ms. Thompson received 88. *See id.* ¶ 21, ECF No. 34-11; *see also id.* Ex. F, ECF No. 34-12 (showing the total points awarded to each candidate and the points summed to obtain those totals). Based on Mr. Willis's high total points and "other factors" that led Mr. Luper to believe Mr. Willis was the most qualified candidate, Mr. Luper selected Mr. Willis for Deputy Regional Manager. Luper Suppl. Decl. ¶ 22, ECF No. 34-11; *see also* Luper Decl. ¶¶ 69–70, ECF No. 34-10 (noting Mr. Willis's "broad knowledge base of regional office functions" and other relevant experience). On March 25, 2009, Mr. Luper forwarded his selection to Mr. Batres for approval. Luper Suppl. Decl. ¶ 24, ECF No. 34-11; *see also id.* Ex. G, ECF No. 34-12 (reproducing Mr. Luper's memorandum addressed to Mr. Batres).

According to Mr. Luper, he evaluated the three candidates' applications without anyone else's input. Luper Suppl. Decl. ¶ 25, ECF No. 34-11. He claims that he spoke with Mr. Batres about Mr. Willis's selection only after he made that selection. *Id.*

In a conversation after Mr. Luper selected Mr. Willis, Mr. Batres and Mr. Luper discussed the selection. *See id.* According to Mr. Batres, they discussed Mr. Willis's military deployment, whether selecting Mr. Willis in this situation would violate any known policies, and whether selecting Mr. Willis would impact the regional office's functioning. Batres 2011 Dep. 46:15–48:1, ECF No. 34-6; Batres 2014 Dep. 51:11–22, ECF No. 34-7. Although Mr. Willis would not return to the United States until September 2009, Mr. Luper was confident that delaying Mr. Willis's service until then would not impact the regional office's functioning. Luper Suppl. Decl. ¶ 27, ECF No. 34-11. Mr. Luper, who had been Deputy Regional Manager until he was promoted to Regional Manager in June 2008, had continued to perform the Deputy

Regional Manager's duties after he was promoted. *Id.* He was comfortable continuing to do both

jobs until September 2009. *Id.*

Mr. Batres recalls that he then assured Mr. Luper that the VA could hold the position for

Mr. Willis until he returned from his military deployment, and that "[i]t was not against the law."

Batres 2011 Dep. 47:20–48:1. Mr. Batres then approved Mr. Luper's selection. *See* Luper Suppl.

Decl. Ex. G, ECF No. 34-12 (showing that Mr. Batres approved of the selection, and displaying

the confirming signature of his program analyst, Greg Harms); *see also* Pl.'s Ex. H, at

13:11–16:17, ECF No. 40-3 (discussing Mr. Harms's role and how he was responsible for

"putting together correspondence for [his] supervisor," Mr. Batres).

Mr. Luper signed a formal "Merit Promotion Certificate" for Mr. Willis on June 4, 2009.

Def.'s Statement ¶ 59; Pl.'s Statement ¶ 59. On June 10, 2009, Ms. Thompson received notice

that she was not selected to be Deputy Regional Manager. Def.'s Statement ¶ 61; Pl.'s Statement

¶ 61. Mr. Willis began working as Deputy Regional Manager in October 2009, once he returned

from active duty in Kuwait and Iraq. Willis Decl. ¶ 1, ECF No. 34-13.[3]

---

[3] Because Ms. Thompson seeks voluntary dismissal of her retaliation claims, facts relevant to those claims are not recounted here. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 18 n.2, ECF No. 40 (seeking dismissal of Ms. Thompson's retaliation claims).

The Court also omits discussion here of Ms. Thompson's later unsuccessful Regional Manager application, which Ms. Thompson mentions in her complaint and in her opposition to summary judgment. *See* Compl. ¶ 24; Pl.'s Opp'n Def.'s Mot. Summ. J. 12–13, 23–24; Pl.'s Counter-Statement ¶¶ 71–86. The Court notes that, in her complaint, Ms. Thompson's discrimination claims specifically refer to a non-promotion in which "a less qualified white male was promoted in her stead," but that a white male was not promoted into the Regional Manager position to which Ms. Thompson applied later. *See* Compl. ¶ 24 ("The regional manager position has never been filled . . . ."); *id.* ¶¶ 29, 32 (alleging that "Defendant . . . unlawfully discriminated . . . against Ms. Thompson . . . when it failed to promote her, though she was qualified and a less qualified white male was promoted in her stead . . . ."); Pl.'s Counter-Statement ¶ 85 ("To this day, the regional manager position for Region 1B has remained vacant . . . ."). The Court therefore construes Ms. Thompson's references to the Regional Manager application as background information that provides more alleged evidence of discriminatory animus in her non-selection for the *Deputy* Regional Manager position, not as an

### E.  Procedural History

After first filing administrative claims against the VA, Ms. Thompson filed suit in this Court. *See* Def.'s Ex. 5, ECF No. 34-3 (reproducing one of Ms. Thompson's administrative complaints, which brought discrimination claims related to her Deputy Regional Manager application); Def.'s Ex. 6, ECF No. 34-3 (reproducing Ms. Thompson's other administrative complaint, which brought retaliation claims); Compl., ECF No. 1. She brought race, sex, and age discrimination claims, as well as retaliation claims, under Title VII of the Civil Rights Act of 1964[4] and the Age Discrimination in Employment Act of 1967 (ADEA).[5] *See* Compl. ¶¶ 1, 28–39.

---

additional discrimination claim. Because Ms. Thompson's argument on this point does not establish evidence on which a jury could infer intentional discrimination, the Court briefly recounts facts surrounding the Regional Manager application later in this opinion. *See infra* Part IV.B.2.e.

To the extent that Ms. Thompson's references to her Regional Manager application are intended as allegations of an additional discrimination claim, Ms. Thompson has not shown a dispute of material fact in response to the VA's position, which contends that she failed to exhaust administrative remedies. *See* Def.'s Mem. P. & A. Supp. Mot. Summ. J. 11 n.7 (arguing that Ms. Thompson failed to exhaust administrative remedies because she did not file an administrative complaint regarding her non-selection for the Regional Manager position); Thompson Dep. 197:15–198:21, ECF No. 34-5 (showing that Ms. Thompson did not file an informal or a formal administrative complaint about her Regional Manager application); *see also* Pl.'s Opp'n Def.'s Mot. Summ. J. 12–13, 23–24 (omitting any reference to an administrative complaint filed about the Regional Manager application); Pl.'s Counter-Statement ¶¶ 71–86 (same). And the Court's independent scrutiny on the exhaustion issue "confirms fatal shortfalls in the evidence necessary to support a verdict" in Ms. Thompson's favor. *See Grimes v. District of Columbia*, 794 F.3d 83, 94–95 (D.C. Cir. 2015) (explaining that a motion for summary judgment may be granted when the nonmoving party has not shown a genuine issue for trial and the Court's independent scrutiny confirms that she lacks evidence necessary to obtain a verdict in her favor). Therefore, the VA would be entitled to summary judgment on any claim arising out of Ms. Thompson's unsuccessful Regional Manager application.

[4] Pub. L. No. 88-352, Title VII, 78 Stat. 241, 253–66 (codified as amended at 42 U.S.C. §§ 2000e–2000e-17).

[5] Pub. L. No. 90-202, 81 Stat. 602 (codified as amended at 29 U.S.C. §§ 621–634).

The government now moves for summary judgment. *See* Mot. Summ. J., ECF No. 34. For her discrimination claims, Ms. Thompson opposes summary judgment. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 19–28, ECF No. 40. But for her retaliation claims, Ms. Thompson seeks voluntary dismissal. *See id.* at 18 n.2.

## III.  DISMISSAL OF THE RETALIATION CLAIMS

Ms. Thompson's complaint brought two claims for retaliation, both listed as "third cause of action." *See* Compl. ¶¶ 34–39. Faced with the government's motion for summary judgment on those claims, Ms. Thompson now seeks to "dismiss[] her claims under the Third and Fourth Causes of Action of her Complaint." Pl.'s Opp'n Def.'s Mot. Summ. J. 18 n.2. The Court presumes that Ms. Thompson, in referring to "the Third and Fourth Causes of Action of her Complaint," refers to the two retaliation claims. *See id.* at 19–28 (opposing summary judgment on Ms. Thompson's discrimination claims, but omitting any arguments about retaliation). The Court will therefore dismiss those claims with prejudice under Federal Rule of Civil Procedure 41(a)(2). *See generally* Fed. R. Civ. P. 41(a) (requiring dismissal by court order when the plaintiff files neither a stipulation of dismissal signed by all parties, nor a notice of dismissal filed before the opposing party serves either an answer or a motion for summary judgment).

## IV.  SUMMARY JUDGMENT ON THE DISCRIMINATION CLAIMS

### A.  Legal Standards

#### 1.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one

capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to determine whether there is a genuine need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-movant may not rest upon mere allegations or denials but must instead present affirmative evidence. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (citing *Anderson*, 477 U.S. at 257).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

2.  Title VII and the ADEA

Title VII declares that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race . . . [or] sex . . . ." 42 U.S.C. § 2000e-16. Similarly, the ADEA declares that "[a]ll personnel actions affecting employees . . . who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). These provisions extend to federal employees "the full rights available in the courts as are granted to individuals in the private sector." *Loeffler v. Frank*, 486 U.S. 549, 558–59 (1988) (internal quotation marks omitted) (quoting *Chandler v. Roudebush*, 425 U.S. 840, 841 (1976)) (discussing Title VII); *see also, e.g.*, *Gomez–Perez v. Potter*, 553 U.S. 474, 491 (2008) (extending the ADEA's private-sector prohibition against retaliation to the federal government). They apply to Ms. Thompson's claims here. *See* 5 U.S.C. § 105 ("'Executive agency' means an Executive department . . . ."); *see also id.* § 101 ("The Executive departments [include] . . . [t]he Department of Veterans Affairs.").

In this circuit, two key cases outline the litigation framework for Title VII and ADEA discrimination cases: *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008). The three-part *McDonnell Douglas* burden-shifting framework applies when a Title VII or ADEA plaintiff offers only indirect evidence of discrimination at summary judgment. *See Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (applying *McDonnell Douglas* to Title VII claims); *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004) (same, for ADEA claims). Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if she does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the

employer's reason was a pretextual cover for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Although *McDonnell Douglas* shifts the burden of production between the parties, the plaintiff retains the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009) (applying this principle in the ADEA context).

In the D.C. Circuit, *Brady* streamlines the *McDonnell Douglas* framework when, in considering a motion for summary judgment, the Court immediately observes that a plaintiff suffered an "adverse employment action" and her employer asserted a "legitimate, non-discriminatory reason" for the alleged discrimination. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). That is the case here: Ms. Thompson suffered an adverse employment action when she was not promoted to Deputy Regional Manager. *See Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (listing possible adverse employment actions, and including "failing to promote" as one of them (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003))). By arguing that Mr. Willis was more qualified, the government has asserted a legitimate, non-discriminatory reason for her non-promotion. *See* Def.'s Mem. P. & A. Supp. Mot. Summ. J. 12–16, ECF No. 34-1.

In this case, therefore, *Brady* directs the Court to forgo *McDonnell Douglas* and instead resolve one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . , sex, or [age]?" *Brady*, 520 F.3d at 494; *see also Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (applying the *Brady* framework to an ADEA claim). Phrased in terms of the facts of this case, the Court must consider whether Ms. Thompson has produced sufficient

evidence for a reasonable jury to find (1) that Mr. Willis's superior qualifications were "not the actual reason" for Ms. Thompson's non-promotion and (2) that the VA intentionally discriminated against Ms. Thompson on the basis of race, sex, or age. To answer this question, the Court must examine the totality of the evidence and ask "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).

### 3.  Comparing Qualifications

When an employer argues that its hiring decision was based on the candidates' relative qualifications, "a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly* better qualified for the job' than those ultimately chosen." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)). "[T]he qualifications gap must be great enough to be inherently indicative of discrimination." *Holcomb*, 433 F.3d at 897. Put another way, when "a reasonable employer would have found the plaintiff to be significantly better qualified for the job" but the defendant-employer nonetheless declines to hire her, "the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc); *accord Mulrain v. Castro*, 760 F.3d 77, 79 (D.C. Cir. 2014).

But "[i]n cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination." *Adeyemi*, 525 F.3d at 1227. Instead, "the jury would 'assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'" *Id.* (quoting *Aka*, 156 F.3d at 1294); *accord Gilbert v. Napolitano*, 670 F.3d 258, 262 (D.C. Cir. 2012). In these cases, courts "'defer to the employer's decision of what nondiscriminatory qualities it will seek' in filling a position," *Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007) (brackets omitted) (quoting *Stewart v. Ashcroft*, 352 F.2d 422, 429 (D.C. Cir. 2003)), and "must respect the employer's unfettered discretion to choose among qualified applicants." *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 26 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). Because the judiciary is not "a super-personnel department that reexamines an entity's business decisions," *Jackson*, 496 F.3d at 707 (internal quotation marks omitted) (quoting *Holcomb*, 433 F.3d at 897), the Court must not "second-guess an employer's personnel decision absent demonstrably discriminatory motive," *Fischbach*, 86 F.3d at 1183 (internal quotation marks omitted) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

To show a demonstrably discriminatory motive, however, "an employment discrimination plaintiff is not limited to arguing that the employer's explanation is wrong on the merits"; she can "show by other means that the explanation was made up to disguise illegitimate bias." *Aka*, 156 F.3d at 1299. For instance, the plaintiff can attempt to show "that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision" or "that the employer's explanation misstates the candidates' qualifications." *Id.* at 1295. A factfinder might also infer discrimination from

evidence showing "procedural irregularities in a highly subjective selection process, " "attitudes suggesting the decision maker harbors discriminatory animus," or "data showing that the defendant employs members of the plaintiff's protected class at rates far below their numbers in the applicant pool and the general population." *See Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012); *Holcomb*, 433 F.3d at 899.

## B. Insufficient Evidence to Support an Inference of Discrimination

Ms. Thompson argues that her qualifications and the circumstantial evidence in this case impugn the government's credibility and would allow a jury to infer discrimination. *See generally* Pl.'s Opp'n Def.'s Mot. Summ. J. 19–28. But, whether considered singly or as a whole, Ms. Thompson's arguments, viewed in light of the evidence, do not show that a reasonable jury could return a verdict in her favor. *See Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006) (holding that, when a plaintiff has produced neither evidence to show that her non-selection was because of her protected class, nor evidence rebutting the employer's legitimate, non-discriminatory reason for selecting another candidate, summary judgment is appropriate).

### 1. Ms. Thompson and Mr. Willis's Comparative Qualifications

To attack the government's proffered legitimate, non-discriminatory reason for selecting Mr. Willis, Ms. Thompson alleges that "an objective assessment of Ms. Thompson's application and performance evaluations, coupled with her credited years of specialized experience," shows that Mr. Willis's qualifications were not superior to Ms. Thompson's. Pl.'s Opp'n Def.'s Mot. Summ. J. 25. In support, she argues that she "had years of experience as a supervisory social worker on the front lines of providing therapeutic counseling to combat veterans, supervising other counseling professionals and actually running a vet center," and Mr. Willis lacked those

qualifications. *Id.* Ms. Thompson also points out that the VA's human resources staff credited her with more years of specialized experience. *See id.* at 24 ("Ms. Thompson was credited with nearly twice as much specialized experience as Mr. [Willis] . . . ."); Pl.'s Ex. J, ECF No. 40-3 (noting Ms. Thompson's nine years and ten months of specialized experience as a supervisory social worker); Pl.'s Ex. K, ECF No. 40-3 (noting Mr. Willis's five years and nine months of specialized experience as an Associate Regional Manager).

Ms. Thompson was indeed well qualified to be Deputy Regional Manager. Because she had both an undergraduate degree and a master's degree in social work, she exceeded the basic requirements for the position. *See* Def.'s Ex. 1, ECF No. 34-2 (listing, as "Basic Requirements" for Deputy Regional Manager candidates, education and experience equivalent to a degree in behavioral or social science); Pl.'s Counter-Statement ¶ 1 (recounting Ms. Thompson's educational background); Def.'s Reply Statement ¶ 1. And because Ms. Thompson had worked as a Team Leader for nine years and ten months, she easily met the requirement that the Deputy Regional Manager have at least one year of specialized experience. *See* Def.'s Ex. 1 (listing, as "Specialized Experience" required for Deputy Regional Manager candidates, one year of specialized experience at the GS-12 level); Pl.'s Ex. J, ECF No. 40-3 (noting, in the VA's record of Ms. Thompson's qualifications, her nine years and ten months of specialized experience). For these reasons, the VA's human resources staff affirmed that Ms. Thompson was qualified to be Deputy Regional Manager. Lepe Decl. ¶ 45, ECF No. 34-14. And even Mr. Luper, after reviewing Ms. Thompson's application and interviewing her, commented that Ms. Thompson possessed relevant qualifications: "She had general experience and knowledge of [the] Regional Counseling Service and she had some experience with recruitment and adverse actions at her vet center." Luper Decl. ¶ 68, ECF No. 34-10.

To rebut the government's qualifications-based explanation, however, the law requires Ms. Thompson to show not just that she was qualified to be Deputy Regional Manager; she must also show that she was "'*significantly* better qualified for the job' than [the person] ultimately chosen." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)). Because Ms. Thompson and Mr. Willis had similar qualifications, Ms. Thompson cannot meet that standard.

Mr. Willis, like Ms. Thompson, had undergraduate and master's degrees in social work. *See* Luper Suppl. Decl. Ex. G, ECF No. 34-12 (reproducing Mr. Willis's resume). With his five years and nine months of experience as one of Region 1B's Associate Regional Managers for Counseling, Mr. Willis also had more than one year of specialized experience. *See* Def.'s Statement ¶ 13; Pl.'s Statement ¶ 13; Pl.'s Ex. K, ECF No. 40-3 (noting Mr. Willis's five years and nine months of experience in the VA's record of Mr. Willis's qualifications). And even though Ms. Thompson received more years credited to her as specialized experience, *see* Pl.'s Exs. J, K, ECF No. 40-3, Mr. Willis's resume shows that he had previously worked for three years in a capacity similar to Ms. Thompson's role as Team Leader, *see* Luper Suppl. Decl. Ex. G, ECF No. 34-12 (showing that between January 1994 and January 1997, Mr. Willis worked as a Clinic Coordinator in an outpatient clinic, where he supervised three health technicians, provided daily resolution of clinic issues, and provided outpatient social work services). Mr. Willis thus had eight years and nine months of experience in a managerial role. Ms. Thompson's nine years and ten months of experience as a Team Leader do not significantly dwarf Mr. Willis's years of comparable experience.[6]

---

[6] Although the VA's human resources officer did not note Mr. Willis's experience as a Clinic Coordinator, she was concerned with rating candidates' applications for *minimum* qualifications only, not overall qualifications. *See* Pl.'s Ex. K, ECF No. 40-3 (noting Mr. Willis's

Mr. Willis's and Ms. Thompson's qualifications differed primarily in the type of specialized experience they possessed. Given his experience as Associate Regional Manager for Counseling, Mr. Willis had more experience with clinical oversight and administrative duties at the region-wide level. *See* Pl.'s Ex. C, ¶ 1, ECF No. 40-3. But Ms. Thompson had more recent experience providing direct service to veterans and supervising clinicians in a close setting. *Compare* Def.'s Ex. 2, ECF No. 34-2 (reproducing Ms. Thompson's Deputy Regional Manager application, which noted her years of experience supervising operations at the Washington, D.C. Vet Center and providing services to combat veterans and their families), *with* Luper Suppl. Decl. Ex. G, ECF No. 34-12 (reproducing Mr. Willis's resume, which does not mention direct service to veterans as part of his role as Associate Regional Manager for Counseling). Both these skill sets would have been desirable in a Deputy Regional Manager. *See* Def.'s Ex. 1, ECF No. 34-2 (including both administrative skills at the region-wide level, such as "[a]bility to conduct quality assurance site surveys," and clinical skills, such as "[k]nowledge of social and rehabilitation readjustment of veterans," in a list of "knowledge, skills and abilities considered essential for successful performance" as a Deputy Regional Manager).

---

experience as Associate Regional Manager and not his experience as a Clinic Coordinator, but doing so on a form titled "Record of *Minimum* Qualifi[cati]on Determination" (emphasis added)); Lepe Decl. ¶ 44, ECF No. 34-14 ("All applications were rated against . . . *minimum* qualification standards . . . . A referral list of all *minimum* qualified candidates was forwarded to the selecting official." (emphases added)). Because Mr. Willis's experience as an Associate Regional Manager satisfied the minimum requirement for specialized experience, the VA's human resources officer did not need to note his experience as a Clinic Coordinator—even though both the Associate Regional Manager position and the Clinic Coordinator position were jobs at the GS-12 grade level. *See* Luper Suppl. Decl. Ex. G, ECF No. 34-12 (labeling both jobs as "GS 12" positions on Mr. Willis's resume). That Mr. Willis's previous specialized experience was not credited to him is therefore insignificant in assessing Ms. Thompson and Mr. Willis's comparative qualifications.

Ms. Thompson's case is thus one "where the comparative qualifications are close."

*Adeyemi*, 525 F.3d at 1227. In this kind of case, juries usually "assume that the employer is more

capable of assessing the significance of small differences in the qualifications of the candidates,

or that the employer simply made a judgment call." *Id.* (internal quotation marks omitted)

(quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)). Courts

therefore "'defer to the [employer's] decision of what nondiscriminatory qualities it will seek' in

filling a position," *Jackson v. Gonzales*, 496 F.3d 703, 708–09 (D.C. Cir. 2007) (alteration in

original) (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)), and refrain from

"second-guess[ing] how an employer weighs particular factors in the hiring decision," *id.*

The law thus allowed the VA, in choosing a Deputy Regional Manager, to weigh Ms.

Thompson and Mr. Willis's respective qualifications as it wished, so long as a candidate's

membership in a protected class was not a factor. For this reason, the Court cannot closely

scrutinize Mr. Luper's assessment of Ms. Thompson and Mr. Willis's qualifications, even though

Ms. Thompson argues that Mr. Luper's scores "were biased assessments and misstatements of

her qualifications." Pl.'s Opp'n Def.'s Mot. Summ. J. 26.[7] Although Mr. Luper gave Ms.

Thompson lower scores that she argues are facially suspect, *see* Luper Suppl. Decl. Exs. B–E,

ECF No. 34-11, he was entitled to assess her qualifications based on his "strategic priorities and

goals at the time, the strengths and weaknesses of the applicant pool, and the overall skills of and

gaps in [his] existing workforce, among many other factors." *Jackson*, 496 F.3d at 708. The

Court may not "second-guess" Mr. Luper's "initial choice of appropriate qualifications," which

may have valued Mr. Willis's region-wide expertise more highly than Ms. Thompson's many

---

[7] Below, the Court addresses Ms. Thompson's allegations of impermissible bias shown through factors other than her own qualifications. *See infra* Part IV.B.2.

recent years in a clinical setting. *See id.*; *see also infra* Part IV.B.2.c (discussing how Mr.

Luper's scoring may have reflected that preference).

In light of the evidence available to the Court, Ms. Thompson has not shown that her

qualifications were so superior to Mr. Willis's that they rebut the VA's proffered reason for

selecting him. *See Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) ("[A] disparity in

qualifications, standing alone, can support an inference of discrimination only when . . . the

plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better

qualified' than the successful candidate." (quoting *Holcomb*, 433 F.3d at 897)).

### 2.  Other Alleged Flaws in the VA's Explanation

Ms. Thompson is not, however, limited to comparing her qualifications to Mr. Willis's;

she can still "seek to expose other flaws in the employer's explanation." *Hamilton v. Geithner*,

666 F.3d 1344, 1352 (D.C. Cir. 2012) (internal quotation mark omitted) (quoting *Holcomb v.*

*Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)). In her opposition brief, Ms. Thompson argues that

procedural irregularities in the selection process and "the context of Ms. Thompson's

non-selection" are evidence of the VA's discriminatory animus. *See* Pl.'s Opp'n Def.'s Mot.

Summ. J. 22–28; *see also Hamilton*, 666 F.3d at 1352 (explaining how "procedural irregularities

in a highly subjective selection process," especially when the plaintiff has superior qualifications,

can be used to show a genuine issue of material fact). The Court considers each of these

arguments in turn.

### a.  Mr. Willis's Application

Ms. Thompson alleges that "Mr. Luper unlawfully assisted Mr. Willis with his

application and mailed it in for him." Pl.'s Opp'n Def.'s Mot. Summ. J. 26–27. The record does

show that Mr. Willis emailed his application to Mr. Luper, who then mailed it to the VA's human resources staff. *See* Pl.'s Ex. F, ECF No. 40-3.

But Ms. Thompson's allegation of impropriety does not mean that race, sex, or age discrimination motivated Mr. Luper to aid Mr. Willis. As the government points out, Mr. Luper's actions could be justified as providing "a mechanism by which employees who are absent because of . . . uniformed service can be considered for promotion." 5 C.F.R. § 353.106(c); *see* Def.'s Reply Supp. Mot. Summ. J. 8–9, ECF No. 44 (making this argument). Ms. Thompson's own exhibit affirms that the VA must follow this policy. *See* Pl.'s Ex. S, ¶ 5.c(4), ECF No. 40-3 ("Employees . . . in military service with restoration rights will be considered for promotion as though they were present for duty.").

Even if Mr. Luper was not motivated by these policies but instead by a desire to promote his friend, a jury still could not find intentional discrimination here. Ms. Thompson stated in her deposition that Mr. Luper and Mr. Willis "were friends" and that Mr. Luper "wanted to keep it that way." Thompson Dep. 161:6–15, ECF No. 34-5. But a plaintiff cannot survive summary judgment merely by showing that the employer was motivated by a *different* non-discriminatory reason; she "shoots [herself] in the foot" by showing "that the real explanation for the employer's behavior is not discrimination, but some other motivation." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc). "Title VII does not . . . prevent employers from favoring employees because of personal relationships": if "a protégé, an old friend, a close relative or a love interest" gets special treatment, "that special treatment is permissible as long as it is not based on an impermissible classification." *Schobert v. Ill. Dep't of Transp.*, 304 F.3d

725, 733 (7th Cir. 2002).[8] Ms. Thompson cannot establish an inference of discrimination with evidence that Mr. Luper selected Mr. Willis solely because of their friendship.

Of course, favoritism can have a racial aspect: "The employer could prefer X over Y because X is his friend, but he might choose to hire a friend of his own race in order to avoid hiring a person of a different race." *Harris v. Hays*, 452 F.3d 714, 722 (8th Cir. 2006) (Gibson, J., concurring); *see also Foster v. Dalton*, 71 F.3d 52, 57 (1st Cir. 1995) (noting that, in a case with evidence of favoritism, the facts could "support an inference of discriminatory intent," but could "equally support a finding of undiluted favoritism, unmixed with racial animus"). To create a triable issue of fact in these circumstances, however, Ms. Thompson must present "'specific and competent evidence' from which a reasonable jury could find discrimination." *Ahmed v. Johnson*, 752 F.3d 490, 498 (1st Cir. 2014) (quoting *Gerald v. Univ. of P.R.*, 707 F.3d 7, 16 (1st Cir. 2013))); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (explaining that "an employer would be entitled to judgment as a matter of law if . . . the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had

---

[8] Other circuits, including the D.C. Circuit, corroborate this legal principle. *See Hendricks v. Geithner*, 568 F.3d 1008, 1014 (D.C. Cir. 2009) (affirming summary judgment when the plaintiff's evidence "supports at most favoritism, not sex discrimination"); *Caldwell v. Washington*, 278 F. App'x 773, 776 (9th Cir. 2008) (holding that, when a plaintiff proves the defendant's stated reasons for hiring someone else were "pretext for offering the position to a personal friend" and not "a pretext for racial discrimination," she does not establish triable issues of fact); *Foster v. Dalton*, 71 F.3d 52, 56 (1st Cir. 1995) ("Title VII does not outlaw cronyism . . . ."); *Md. Troopers Ass'n v. Evans*, 993 F.2d 1072, 1077 (4th Cir. 1993) ("Rigging scores for one's friends is plainly no way to run [an organization]; nonetheless it is not the same kind of iniquity as racial discrimination."); *Goostree v. Tennessee*, 796 F.2d 854, 862 (6th Cir. 1986) (noting the difference between "a hiring process that proceeds based on legally impermissible distinctions between candidates" and a "patronage system that relies on family, friends, and political allies" (internal quotation mark omitted) (quoting *Avery v. Jennings*, 786 F.2d 233, 237 (6th Cir. 1986))).

occurred"); *Harris*, 452 F.3d at 723 (Gibson, J., concurring) ("The question of whether the favoritism had a racial aspect must be evaluated on the myriad peculiar facts of the case, such as the closeness of the relationship between employer and successful candidate . . . , the relative qualifications of the candidates, the employer's workplace environment, etc.").

Here, Ms. Thompson has created "a weak issue of fact" at most. *Reeves*, 530 U.S. at 148. Beyond her deposition testimony, the only other evidence of Mr. Luper and Mr. Willis's friendship is in emails between the two, which do show that the two had an amiable relationship. *See* Pl.'s Ex. F, ECF No. 40-3 (showing that Mr. Willis conveyed details about his situation in the Middle East to Mr. Luper, and Mr. Luper congratulated Mr. Willis on being made a captain in his military unit). But these emails may not show anything more than a friendly professional relationship.[9] In that way, they are consistent with Mr. Luper's declaration, in which Mr. Luper stated that he was "not personal friends" with Mr. Willis, but instead merely supervised him when he was an Associate Regional Manager for Counseling. *See* Luper Decl. ¶ 55, ECF No. 34-10. Moreover, the emails lack any reference to potential applicants' sex, race, or age. *See* Pl.'s Ex. F. And neither Mr. Willis nor Mr. Luper knew for certain at the time what the sex, race, and age composition of the applicant pool would be. *See* Pl.'s Ex. F (showing that Mr. Willis and Mr. Luper corresponded in January and February 2009); Pl.'s Ex. G, ECF No. 40-3 (showing that, on March 11, 2009, Mr. Luper did not know the names of the Deputy Regional Manager

---

[9] When asking Mr. Luper to help him mail in his application, Mr. Willis does acknowledge that this procedure was unusual: "I know you can't send in a government envelope so I will owe you big for this." Pl.'s Ex. F, ECF No. 40-3. But Mr. Willis's comment may simply acknowledge that Mr. Luper would have to supply his own envelope and postage. Regardless, it does not show discriminatory animus from Mr. Willis or Mr. Luper. As discussed below, its context is devoid of any reference to potential applicants' sex, race, or age, and neither Mr. Willis nor Mr. Luper knew at the time what the sex, race, and age composition of the applicant pool would be.

candidates). Absent more evidence of favoritism mixed with discriminatory animus,

Ms. Thompson has not created a genuine issue of material fact on this issue.

### b. Interview Process

Ms. Thompson also alludes to irregularities in the interview Mr. Luper conducted with

her: "Ms. Thompson's 'interview' consisted of a 'brief, unscheduled phone call' . . . that lasted

three (3) minutes," even though "[p]erformance-based interviews . . . were required and were to

be job-related, consistent and fair to all candidates." Pl.'s Opp'n Def.'s Mot. Summ. J. 8; *see*

*also* Pl.'s Counter-Statement ¶¶ 30–31; Pl.'s Ex. EE, ¶ 7, ECF No. 40-3 (discussing

Ms. Thompson's experience with interviews in the Readjustment Counseling Service). Ms.

Thompson specifically notes that Mr. Luper "did not inform her that [the phone call] was an

interview for the vacancy announcement or schedule the interview in advance as was regional

practice." Pl.'s Opp'n Def.'s Mot. Summ. J. 8.

"Along with disparate qualifications of the applicants, procedural irregularities in the

selection process also may demonstrate that the employer's justification for a hiring or

promotion decision was pretextual." *Kilby-Robb v. Duncan*, 77 F. Supp. 3d 164, 174 (D.D.C.

2015) (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1355 (D.C. Cir. 2012)). For instance,

summary judgment may be inappropriate when contemporaneous documentation supporting the

employer's justification is missing. *See, e.g.*, *Hamilton*, 666. F.3d at 1355–56 (holding that

missing documentation of an interviewing panel's deliberations, coupled with a missing page of

interview notes, could lead a reasonable jury to doubt the employer's interview-based

explanation); *Browne v. Donovan*, 12 F. Supp. 3d 145, 153 (D.D.C. 2014) (same, for missing

interview notes).

But here, Ms. Thompson's argument about the interview process fails for two reasons.
First, she does not establish that Mr. Luper's interview process was actually "irregular."
Ms. Thompson's Exhibit T appears to describe human resources policies governing VA hiring.
*See* Pl.'s Ex. T. Although Ms. Thompson correctly notes that the document requires interviews to
be "performance-based" and "based on job-related competencies," the exhibit does not require
interviews to be scheduled in advance. *See id.* Of the evidence presented to the Court, only
Ms. Thompson's own deposition testimony and declaration corroborate her view that the
interview did not match regional practice. *See* Thompson Dep. 115:5–21, ECF No. 34-5
(denying that Ms. Thompson's phone call with Mr. Luper was an appropriate interview because
Mr. Luper "never called [her] and scheduled [her] for an interview, which was the practice in the
region"); Pl.'s Ex. EE, ¶ 7, ECF No. 40-3 (discussing Ms. Thompson's interviewing experiences
in a declaration). But Ms. Thompson's views were based on her experience interviewing
candidates in her Vet Center and other Vet Centers, including "on [hiring] boards with Terry
Luper." Thompson Dep. 115:15–18; Pl.'s Ex. EE, ¶ 7. Her experiences thus may reflect only
regional practice for hiring Vet Center staff—not necessarily for regional office hiring. *See* Pl.'s
Ex. B, ¶ 4.02.b(3), ECF No. 40-3 (describing a Team Leader's duties, which include
"[s]elect[ing] . . . counselors and office managers," but not selecting regional office personnel).
And because Mr. Luper's interview questions relate to the KSAs for the Deputy Regional
Manager position, there is no evidence that Mr. Luper's interview questions were not
"performance-based." *Compare* Luper Suppl. Decl. Ex. D, ECF No. 34-11 (listing Mr. Luper's
interview questions, which sought the candidates' ideas for improving the region and
information about the candidates' experience with congressional matters, recruiting, adverse
actions, and performance evaluations), *with* Def.'s Ex. 1, ECF No. 34-2 (listing KSAs that

included items such as "[a]bility to supervise professional clinicians . . . and take administrative action when appropriate," "[a]bility to . . . assist teams in quality improvement . . . and make recommendations for corrective action," and "[a]bility to . . . prepare . . . Congressional responses").

Second, even if Mr. Luper's interview process was inconsistent with regional practice, the process's irregularities do not support an inference of discrimination. Ms. Thompson alleges that the interviews "were to be . . . fair to all candidates"; Mr. Luper implicitly agreed with her statement when he declared that "all applicants must be asked the same questions during interviews." Pl.'s Opp'n Def.'s Mot. Summ. J. 8.; Luper Decl. ¶ 70, ECF No. 34-10. The evidence on record does not indicate that Mr. Luper interviewed Ms. Sprecher and Mr. Willis differently from Ms. Thompson, nor that Mr. Luper gave either Ms. Sprecher or Mr. Willis advance notice. *See* Luper Suppl. Decl. ¶ 15, ECF No. 34-11 (indicating that Mr. Luper "asked all three candidates the same questions and interviewed all three candidates on the same day"); *id.* Ex. D, ECF No. 34-11 (recording the five identical questions asked to each candidate, along with the candidates' responses). Because, without evidence of procedural irregularities that affected the plaintiff but not other candidates, a reasonable jury would not find unlawful discrimination, Ms. Thompson's complaints about the interview process do not create a triable issue of fact. *Cf. Hamilton*, 666 F.3d at 1352, 1355–56 (discussing "procedural irregularities" specific to the plaintiff's interview, not irregularities affecting candidates' interviews in general); *Browne*, 12 F. Supp. 3d at 153 (same).

### c.  Scoring Process and the Candidates' Qualifications

Ms. Thompson also alleges improper bias shown through improprieties in Mr. Luper's

Deputy Regional Manager scoring process. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 24–26.

Specifically, Ms. Thompson makes much of

(1)     the thirty-point difference between Ms. Thompson's and Mr. Willis's
        scores based on the Deputy Regional Manager job description, *see* Luper
        Suppl. Decl. Ex. B, ECF No. 34-11;

(2)     how that difference was originally, at forty-six points, even larger, *see id.*
        (showing where scores were changed in Ms. Thompson's favor); and

(3)     the forty-three-point difference between Ms. Thompson's and Mr. Willis's
        total scores, *see id.* Ex. F, ECF No. 34-12.

*See* Pl.'s Opp'n Def.'s Mot. Summ. J. 24–25. These differences, Ms. Thompson argues, are "so

great as to be inherently indicative of discrimination." *Id.* at 25.

Like her arguments about Mr. Willis's application and the interview process, however,

Ms. Thompson's argument here does not raise a genuine issue of material fact. The differences

between Ms. Thompson's and Mr. Willis's scores are justifiable if Mr. Willis is more qualified

than Ms. Thompson. And that is exactly what the government argues when offering its legitimate

and non-discriminatory reason for Ms. Thompson's non-selection. *See* Def.'s Mem. P. & A.

Supp. Mot. Summ. J. 10–17.

Although Ms. Thompson insists that "an objective assessment" cannot support the

proposition that Mr. Willis's qualifications were so superior to her own, the Court disagrees. *Cf.*

Pl.'s Opp'n Def.'s Mot. Summ. J. 25. As discussed earlier, Ms. Thompson's case is one "where

the comparative qualifications are close" and juries usually "assume that the employer is more

capable of assessing the significance of small differences in the [candidates'] qualifications."

*Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (internal quotation marks

omitted) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)); *see*

*supra* Part IV.B.1. Mr. Luper was therefore entitled to assess Ms. Thompson's qualifications

based on his "strategic priorities and goals at the time, the strengths and weaknesses of the

applicant pool, and the overall skills of and gaps in [his] existing workforce, among many other

factors." *Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007). Even if the difference

between Ms. Thompson and Mr. Willis's scores seems large in light of their comparable

qualifications, *see supra* Part IV.B.1, the law allowed Mr. Luper to give greater weight to some

nondiscriminatory qualifications over others, depending on his needs at the time. His scoring

system, and the varied scores it generated, reflect that kind of weighing process.

Specifically, Mr. Luper's scores in general reflect a favorable view of candidates with

region-wide experience. For instance, Mr. Luper's scores based on the Deputy Regional

Manager position description give Ms. Thompson fewer points, as compared to Ms. Sprecher

and Mr. Willis, for Deputy Regional Manager duties associated with region-wide experience,

such as "[r]outinely visit Vet Center sites to review on-site operations," "[p]lan and organize

curriculum and faculty for regional and local training programs," "[w]ill have skill in dealing

with policy decision makers . . . such as  . . . Medical Center Directors, Service Chiefs and

Central Office hierarchy," and "[w]ill have skill in understanding the political and institutional

context in which decisions are made and implemented." Luper Suppl. Decl. Ex. B, ECF

No. 34-11.[10] Mr. Luper's scores based on the KSAs likewise gave Ms. Thompson fewer points

---

[10] The Deputy Regional Manager position description included descriptions of other
duties associated with region-wide experience: "[a]ssist the Regional Manager in developing a
program of professional services consistent with . . . local veterans' needs and with the
requirements of the law and R[eadjustment] C[ounseling] S[ervice] policy guidance," "[p]rovide
technical program guidance to the teams," "assist[] the Regional Manager in planning,
performing, coordinating and evaluating the internal management of the region," "will have skill
in interacting with other specialists and experts both within and without the D[epartment of]
V[eterans] A[ffairs]," "[w]ill have skill in interacting with other . . . Regional Office staffs," and
"assist the Regional Manager in developing formal relationships with leaders of city, county and

when assessing her "[a]bility to make quality assurance site surveys," a skill that Ms. Sprecher

and Mr. Willis would have acquired through their region-wide experience as Associate Regional

Managers for Counseling. *Id.* Ex. C, ECF No. 34-11. Because the Court may not "second-guess

how an employer weighs particular factors in the hiring decision," Ms. Thompson's allegations

along these lines do not raise a triable issue of fact. *See Jackson*, 496 F.3d at 708–09.

 To be sure, several Deputy Regional Manager duties do not seem closely associated with

region-wide experience:

> "[a]ssess the professional strengths and weaknesses of individual team members
> and determine if work activities of team members are being concentrated in their
> individual areas of maximum skills,"

> "[r]ecommend and help initiate staff development activities, clinical program
> changes and/or personnel actions based on actual work performance of the
> counseling staff,"

> "evaluate the appropriateness and quality of the training curriculum and faculty
> selection,"

> "[w]ill possess the ability to deal with unusual circumstances, which require
> creative, appropriate responses, often under rigid deadlines, with incomplete and
> conflicting information," and

> "[w]ill possess the ability to evaluate, interpret, synthesize, and simplify
> information and develop and present to the Regional Manager a range of
> alternatives for the solution of a problem."

Luper Suppl. Decl. Ex. B, ECF No. 34-11.

 But even though Ms. Thompson received lower scores than Mr. Willis for these duties,

*see id.*,[11] the Court still may not "second-guess" Mr. Luper's scoring, given that Mr. Luper was

---

state health care delivery systems personnel." Luper Suppl. Decl. Ex. B, ECF No. 34-11. For
these duties, Ms. Thompson's lack of region-wide experience justifies her lower scores.

 [11] For other Deputy Regional Manager duties that do not seem closely associated with
region-wide experience, Ms. Thompson received the same score as Mr. Willis. These duties are
"[a]ssist the Regional Manager to plan and organize region wide performance controls . . . by
using knowledge, skills and abilities pertaining to the goals and objectives of the Readjustment
Counseling Service," "[p]lan and organize region wide quality controls . . . by using expert

faced with two qualified candidates. *See Jackson*, 496 F.3d at 708–09. Because Mr. Luper knew

both Ms. Thompson and Mr. Willis "very well," having supervised them both, he had at his

disposal much more information about them than is available to the Court in their applications.

*See* Luper Decl. ¶ 55. With that information, he could make a "judgment call" about whether

Ms. Thompson or Mr. Willis would be better able to, for instance, "evaluate the appropriateness

and quality of the training curriculum" or "deal with unusual circumstances." Luper Suppl. Decl.

Ex. B, ECF No. 34-11; *see Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en

banc) (explaining that, "[i]n a close case, a reasonable juror would usually assume that the

employer is more capable of assessing the significance of small differences in the qualifications

of the candidates, or that the employer simply made a judgment call").

As noted before, an objective evaluation of Ms. Thompson and Mr. Willis's

qualifications does not show that Ms. Thompson had substantially superior qualifications, and so

Mr. Luper was entitled to make these judgment calls. *See supra* Part IV.B.1. And though an

employer's reliance on subjective criteria can call its nondiscriminatory justification into

question, reliance on subjective criteria is most suspect in a situation where the plaintiff has

superior qualifications. *See, e.g.*, *Hamilton v. Geithner*, 666 F.3d 1344, 1352–57 (D.C. Cir. 2012)

(finding a genuine issue of material fact when the employer's proffered nondiscriminatory

explanation was "highly subjective" *and* there was "a significant disparity in the candidates'

qualifications"); *see also Harris v. Grp. Health Ass'n, Inc.*, 662 F.2d 869, 873 (D.C. Cir. 1981)

("While it is true that subjective criteria lend themselves to racially discriminatory abuse more

---

knowledge, skills and abilities pertaining to the problems and needs of combat veterans and their
families," "possess the ability to exercise judgment in all phases of management," "conduct
regional telecommunications conference calls," and "[h]elp to establish policy and program
guidelines for the region by providing information and recommendations as requested." Luper
Suppl. Decl. Ex. B, ECF No. 34-11.

readily than do objective criteria, there nonetheless are situations where employment decisions can, must, and should be made on the basis of subjective criteria."). Here, by contrast, because Ms. Thompson lacked substantially superior qualifications, absent "other evidence that race[, sex, or age] played a part in the decision," the Court cannot re-examine the nuances of Mr. Luper's scoring decisions. *See Jackson*, 496 F.3d at 708 (quoting *Stewart v. Ashcroft*, 352 F.2d 422, 430 (D.C. Cir. 2003)).

Arguing from another perspective, Ms. Thompson notes that, for her scores related to the Deputy Regional Manager position description, some scores were adjusted upward: "Mr. Luper had actually intended on awarding Ms. Thompson '1s' on *nine* of the twenty factors . . . . At some subsequent point, Mr. Luper *changed* Ms. Thompson's score and awarded her '3s' for those nine factors." Pl.'s Opp'n Def.'s Mot. Summ. J. 10; *see also* Luper Suppl. Decl. Ex. B, ECF No. 34-11 (showing where Mr. Luper wrote "3" over nine of Ms. Thompson's previous scores of "1"). Although the VA does not provide a narrative for why Mr. Luper changed Ms. Thompson's scores, *see* Def.'s Reply Supp. Mot. Summ. J. 8, the D.C. Circuit has noted that "[a]n inability to clearly articulate the reasoning behind the specific allocation of numerical scores" may speak "less to any effort to mask an alternative unlawful purpose behind [a] decision and more to a sloppiness in organizing this aspect of the [selection] process." *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 27 (D.C. Cir. 2013). The Court must therefore heed the general principle that "[e]ven if a court suspects that a job applicant 'was victimized by poor selection procedures' it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

Evidence of demonstrably discriminatory motive is lacking here. All of Mr. Luper's changed scores relate to Deputy Regional Manager duties that resembled duties that an Associate Regional Manager like Mr. Willis might perform, but a Vet Center's Team Leader like Ms. Thompson might not perform, might perform less frequently, or might perform in a more limited context:

> "[a]ssist the Regional Manager to plan and organize region wide performance controls,"

> "[r]outinely visit Vet Center sites,"

> "[p]lan and organize curriculum and faculty for regional and local training programs,"

> "[p]lan and organize region wide quality controls,"

> "evaluate the appropriateness and quality of training curriculum,"

> "assist[] the Regional Manager in planning, performing, coordinating and evaluating the internal management of the region,"

> "possess the ability to exercise judgment in all phases of management,"

> "possess the ability to evaluate, interpret, synthesize, and simplify information and develop and present to the Regional Manager a range of alternatives for the solution of a problem," and

> "[h]elp to establish policy and program guidelines for the region by providing information and recommendations as requested by the Regional Manager."

Luper Suppl. Decl. Ex. B. Almost all of these duties have a region-wide component, or expressly require the Deputy Regional Manager to assist the Regional Manager.

But, of course, the ability to perform these duties could come from transferrable skills that Ms. Thompson gained as a Team Leader, as well as from experience at the region-wide level that Mr. Willis had as an Associate Regional Manager. It is fully possible that, upon realizing that Ms. Thompson would have transferrable skills from her Team Leader experience, Mr. Luper gave her more points accordingly. Thus, as they are presented now, Mr. Luper's scores justify

the VA's argument that Mr. Luper chose Mr. Willis over Ms. Thompson based on an assessment of their qualifications, though with weight given to experience at the region-wide level. And, as discussed later, there is no evidence that, to align his scoring with his proffered justification, Mr. Luper fabricated his scores after he chose Mr. Willis. *See infra* Part IV.B.2.d.

The hiring process is "dynamic." *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007). The law therefore permits Mr. Luper to reconsider his scores when assessing candidates' qualifications, so long as he has no discriminatory motive in doing so. *See id.* ("[C]ourts must be sensitive to the necessary and appropriate realities of hiring processes."). Given that Ms. Thompson has not shown that her qualifications were significantly superior to Mr. Willis's and has not otherwise presented evidence of demonstrably discriminatory motive, the Court will not "second-guess" Mr. Luper's scoring, even if some of the scores were changed (in Ms. Thompson's favor); the Court cannot now, based solely on the cold record before it, fully replicate Mr. Luper's nuanced weighing of the applicants' relative qualifications. *See id.* at 708–09.

Lastly, Ms. Thompson's interpretation of the scores does not receive support from the case she cites, *Lathram v. Snow*, 336 F.3d 1085 (D.C. Cir. 2003). In *Lathram*, the plaintiff was not hired as a Public Affairs Specialist even though she had already worked as a Public Affairs Specialist for three years; the person hired in her stead had no experience in public affairs. 336 F.3d at 1091–92. In those circumstances, the D.C. Circuit held that, "because a reasonable jury could find that [the plaintiff] was not only qualified for the job but substantially more qualified than [the person hired]," a jury could conclude that the government's contrary assertions were pretextual. *Id.* at 1092. In that case, therefore, summary judgment was improper. *Id.*

*Lathram*, however, merely reiterates the principle discussed above: "In order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006); *see supra* Parts IV.A.3, IV.B.1. Thus, for *Lathram* to change the outcome here, Ms. Thompson must have been not only as qualified as Mr. Willis, but also "substantially more qualified" than him. *See Lathram*, 336 F.3d at 1092. That is not the case. Without meritorious allegations of "other flaws" in the VA's explanation for Mr. Willis's selection, *see Holcomb*, 433 F.3d at 897, Ms. Thompson's qualifications-based attacks on Mr. Luper's scoring would not allow a jury to find intentional discrimination against Ms. Thompson on the basis of her race, sex, or age. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).[12]

---

[12] Ms. Thompson also charges Mr. Luper with "falsely claiming" that Mr. Willis was a veteran. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 26. Even if it was technically improper for Mr. Luper to label Mr. Willis a "veteran," "an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005).

Mr. Luper gave Mr. Willis five points for veteran status because he knew that Mr. Willis "was on active duty in Iraq at that time." Luper Suppl. Decl. ¶ 20, ECF No. 34-11. Federal law appears, however, to withhold veterans' preference from those, like Mr. Willis, who served in Operation Iraqi Freedom and whose service was through a state Reserve unit. *See* 5 C.F.R. § 211.102(a)(6), (f)(2) (defining "[v]eteran" for purposes of veterans' preference to include those who served in active duty in Operation Iraqi Freedom, but defining "[a]ctive duty" to exclude "service in the Reserves"); *see also* 5 U.S.C. § 2108(1)(D) (defining "[v]eteran" for purposes of veterans' preference to include those who served in active duty in Operation Iraqi Freedom); 38 U.S.C. § 101(10), (21) (defining "active duty" to include "full-time duty in the Armed Forces," but defining "Armed Forces" without including state Reserve units); Luper Suppl. Decl. Ex. G, ECF No. 34-12 (reproducing Mr. Willis's military orders, in which the Pennsylvania Adjutant General ordered Mr. Willis "to active duty as a member of [his] Reserve Component Unit").

But Mr. Luper believed that Mr. Willis served as part of the Pennsylvania Army National Guard. *See* Luper Suppl. Decl. Ex. G (stating in Mr. Luper's memorandum that "Mr. Willis is a Captain in the Pennsylvania Army National Guard"). And the Office of Personnel Management (OPM)'s website indicates that veterans of the National Guard do qualify for veterans' preference "when called or mustered into active *Federal Service*"—which would imply that Mr. Willis would have been eligible for veterans' preference after he was discharged from his service in the Middle East. *See* U.S. Office of Personnel Mgmt., *Veterans Employment Initiative—Vet Guide*, at App. B, https://www.opm.gov/policy-data-oversight/veterans-

#### d.  Production of the Scoring Sheets

The substance of Ms. Thompson's and Mr. Willis's scores aside, Ms. Thompson argues that the scores raise an inference of discrimination because of the manner in which they were produced. Ms. Thompson finds it suspicious that the government produced Mr. Luper's scoring sheets in federal court "for the first time in nearly 5 years of litigation." Pl.'s Opp'n Def.'s Mot. Summ. J. 22. Ms. Thompson argues, without citation, that the government was ordered to produce the scoring documents when Ms. Thompson's administrative claims were pending. *See id.* at 22–23. On these grounds, Ms. Thompson contends that "a reasonable jury could only conclude that these scoring sheets and their underlying scores simply did not exist at the time of Ms. Thompson's non-selection." *Id.* at 23.

But Ms. Thompson's argument is again unsupported by the evidence. The current record does not corroborate her contention that the government fabricated Mr. Luper's scoring sheets. Although Ms. Thompson has produced evidence that a request for documents was mailed to Mr. Batres and was discussed with Readjustment Counseling Service staff, her evidence does not show that Mr. Luper ever received the request for relevant documents. *See* Pl.'s Ex. Q, ECF No. 40-3 (including letters to Mr. Batres that appear to request "[e]valuation criteria and

---

employment-initiative/vet-guide/#9 (last visited March 14, 2016). Although the applicable federal regulation still withholds veterans' preference from those who served in Operation Iraqi Freedom and whose service was through the National Guard, *see* 5 C.F.R. § 211.102(f)(2) (defining "[a]ctive duty" to exclude "service . . . in the National Guard"), OPM's website creates some confusion on this issue. And Ms. Thompson has not provided any evidence that Mr. Luper did not have "a reasonable belief" that Mr. Willis was entitled to veteran status. *George*, 407 F.3d at 415. Accordingly, the points Mr. Willis received for veteran status do not suggest that Mr. Luper intentionally discriminated against Ms. Thompson on the basis of race, sex, or age. In fact, the point difference between Ms. Thompson and Mr. Willis was so great that it would be illogical for Mr. Luper to falsely claim, when it would make no difference in the ultimate outcome, that Mr Willis was entitled to five veterans' points. *See supra* Part II.D (noting that Mr. Willis received 131 points and Ms. Thompson received 88).

interview questions used by the . . . selecting official," including "notes, score sheets, and matrices," but no documentation that Mr. Batres received the letters or forwarded the requests to Mr. Luper). When Mr. Luper himself submitted a declaration for Ms. Thompson's administrative case, he responded to an administrative questionnaire that did not ask him to produce relevant documents. *See* Luper Decl. ¶¶ 50–91, ECF No. 34-10. Likewise, when a VA human resources employee, Edna Lepe, submitted a declaration for Ms. Thompson's administrative case, Ms. Lepe's questionnaire did not ask her to furnish any documents. *See* Lepe Decl. ¶¶ 39–60, ECF No. 34-14. And when Mr. Batres was deposed for Ms. Thompson's administrative case, he did not receive questions about documents used to evaluate the Deputy Regional Manager candidates, nor questions about requests for those documents. *See* Batres 2011 Dep. 35:11–14, 39:20–50:15, ECF No. 34-6.

At most, the evidence on record merits an inference that Mr. Batres received an administrative request for documents, but Mr. Luper did not. *See* Pl.'s Ex. Q (documenting, in emails between members of the VA's Equal Employment Opportunity staff, confusion about how to relay the request for documents to Mr. Luper, but lacking evidence that Mr. Luper ever received the request). And the administrative request for documents Ms. Thompson produced does not specify that Mr. Batres, if he received it, was responsible for forwarding the request to Mr. Luper. *See id.* (directing the request's recipient to "provide documents" but not to forward the request to relevant subordinates). Thus, simply because these documents were not produced at the administrative level does not merit an inference that they were fabricated, particularly if no one ever previously asked Mr. Luper for them. Because Ms. Thompson has not furnished evidence to support her argument that Mr. Luper's scoring sheets were fabricated, that argument would not allow a jury to find that Mr. Luper or the VA intentionally discriminated against

Ms. Thompson on the basis of race, sex, or age. *See Brady v. Office of Sergeant at Arms*, 520

F.3d 490, 494 (D.C. Cir. 2008).[13]

### e. The Readjustment Counseling Service

Broadening her focus, Ms. Thompson also attempts to show discrimination by reference

to alleged improprieties affecting the VA's Readjustment Counseling Service as a whole. *See*

Pl.'s Opp'n Def.'s Mot. Summ. J. 12–17, 23, 27–28. Her arguments along these lines are chiefly

that

(1)   "[f]or over three decades, only one African-American woman has . . . become a regional manager," *id.* at 27;

(2)   the Service "*still* has no African-American females as either regional managers or deputy regional managers" and it has "only one white female" at that level today, *id.*;

---

[13] Ms. Thompson also argues that the government changed course between the administrative proceedings and now. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 22 ("[D]efendant now appears to have abandoned the reason Mr. Luper *first* proffered in his 2010 sworn declaration to the [administrative] investigator."). She notes that Mr. Luper did not proffer his scoring sheets at the administrative level and instead wrote that Mr. Willis was chosen because of his experience. *Id.*; *see also* Luper Decl. ¶ 69, ECF No. 34-10 (justifying Mr. Luper's selection by reference to Mr. Willis's "6 years [of] region wide experience as associate regional manager for counseling" and "3 years experience as coordinator of [a] V[eterans] H[ealth] A[dministration] community based outpatient clinic").

To be sure, "shifting and inconsistent justifications are 'probative of pretext.'" *Walker v. Johnson*, 798 F.3d 1085, 1094 (D.C. Cir. 2015) (alteration and internal quotation marks omitted) (quoting *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011)). But "an elaboration" of a previously given justification "generally is not." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012); *see also Walker*, 798 F.3d at 1094 (explaining that "fine descriptive differences between materially consistent accounts, without more, do not tend to make the accounts unworthy of belief, let alone support an inference of discrimination"). Here, as the government notes, Mr. Luper's scoring sheets are compatible with his response in the administrative case. Def.'s Reply Supp. Mot. Summ. J. 3. Instead of contradicting Mr. Luper's response, the scoring sheets supplement and justify the assertion that Mr. Willis's experience was critical to Mr. Luper's decision to hire him. *See supra* Part IV.B.2.c (discussing how Mr. Willis's region-wide experience justified his higher scores). Because Mr. Luper's scoring sheets serve as an "elaboration" of his previously given justification, Ms. Thompson's allegation that the government changed course does not provide grounds on which a jury could infer intentional discrimination on the basis of race, sex, or age.

(3)     "[a]nother African-American woman, Vivian Vasser, had applied for almost every open regional or deputy regional manager position since at least 2007, to no avail," *id.* at 12–15, 23, 27;

(4)     "both Ms. Thompson and Ms. Vasser . . . applied for a position [the Region 1B Regional Manager position] for which both were qualified . . . , only to have the certificate [of eligible applicants], along with Ms. Thompson's actual application, apparently vanish," *id.* at 23–24; Pl.'s Counter-Statement ¶¶ 71–78, 85; and

(5)     fabrication of documents in this case is conceivable, given that Mr. Batres was cited by the VA's Office of Inspector General (OIG) for inappropriate personnel practices, Pl.'s Opp'n Def.'s Mot. Summ. J. 13–17, 23.

But these arguments also lack merit. If they were supported, Ms. Thompson's allegations of discrimination elsewhere in the Service could bolster her individual claim of discrimination. *See Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006) (explaining that a Title VII plaintiff can challenge an employer's legitimate, non-discriminatory explanation with "data showing that the defendant employs members of the plaintiff's protected class at rates far below their numbers in the applicant pool and the general population"); *Artis v. Yellen*, 309 F.R.D. 69, 74 (D.D.C. 2015) (noting that evidence of a pattern or practice of discrimination can be collateral evidence to support an individual's discrimination claim). However, her allegations lack evidentiary support. For the contentions about the race and sex of the Service's Regional Managers and Deputy Regional Managers, Ms. Thompson cites no supporting evidence. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 27. Indeed, the evidence furnished to the Court does not include even a comprehensive list of people who currently serve as Regional Managers and Deputy Regional Managers. *See, e.g.*, Pl.'s Ex. D, ECF No. 40-3 (providing just a list of Region 1B's key staff, not a list of Regional Managers and Deputy Regional Managers nationwide).

Even if Ms. Thompson had evidence supporting her allegations about the dearth of African-American women, she lacks comparative data about African-American women's prevalence "in the applicant pool and the general population." *Holcomb*, 433 F.3d at 899. "It is

insufficient to merely show that one protected group forms a small percentage of the employer's workforce . . . ; the plaintiff must compare the number of minorities hired with the number of minority applicants that were qualified for the position." *Bolden v. Clinton*, 847 F. Supp. 2d 28, 35 (D.D.C. 2012). Moreover, putative disparities must be statistically significant to be probative of discrimination. *See id.* (holding that a "plaintiff's failure to establish the statistical significance of [her] evidence fatally undermines [her] claim"). Ms. Thompson does not compare the number of high-level African-American females in the Readjustment Counseling Service to their prevalence in the applicant pool and the general population. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 23–28. Nor does she produce any evidence that her numerical allegations are statistically significant. *See id.* Ms. Thompson's "mere description of the composition of a workforce, without more, does not support an inference of discrimination." *Bolden*, 847 F. Supp. 2d at 35; *see also Koger v. Reno*, 98 F.3d 631, 639 (D.C. Cir. 1996) (affirming summary judgment when, "[f]or all [the court knew] from the plaintiffs' data, the magnitude of the [alleged] disparity [was] *de minimis*").[14]

Likewise, in discussing Ms. Vasser's case, Ms. Thompson cites documents that are not evidence of discrimination. For instance, by citing Ms. Vasser's complaint against the VA in federal court, Ms. Thompson does not refer to actual evidence of discrimination against

---

[14] In alleging systematic bias against African-American females, Ms. Thompson also produces no evidence indicating that Mr. Luper was involved with hiring for other Regional Manager or Deputy Regional Manager positions. *See* Pl.'s Opp'n Def.'s Summ. J. 23–28 (making no argument linking Mr. Luper to other hiring decisions); Pl.'s Counter-Statement ¶¶ 7–8 (alleging no facts linking Mr. Luper to other Regional Manager or Deputy Regional Manager hiring decisions). Statistical evidence of discrimination is "ordinarily not dispositive," *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984); it is "even less meaningful" when it does not directly relate to "the type of disparate treatment about which plaintiff complains," *Davis v. Joseph J. Magnolia, Inc.*, 815 F. Supp. 2d 270, 280 n.6 (D.D.C. 2011). Because no evidence links Mr. Luper to the pervasive bias Ms. Thompson alleges, her allegations along these lines do not support an inference of discrimination in her individual case.

Ms. Vasser. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 12–15; *see also* Pl.'s Ex. PP, ECF No. 40-3

(reproducing Ms. Vasser's federal complaint, which includes allegations against the VA but

lacks evidentiary exhibits). *See generally Hairston v. Vance–Cooks*, 773 F.3d 266, 274 (D.C.

Cir. 2014) (rejecting the argument that "discrimination complaints filed in the past . . . establish

institutional discrimination"); *Holcomb*, 433 F.3d at 899–900 (finding unpersuasive as a proxy

for discriminatory animus "the mere filing of two informal discrimination complaints against [a

selecting official], where nothing more is known about the nature, merit, or outcome of those

complaints"). And other cited documents merely memorialize the process surrounding

Ms. Vasser's and others' applications for a Regional Manager position; they do not substantiate

allegations of discrimination. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 12–13; *see also* Pl.'s Ex. JJ,

ECF No. 40-3 (reproducing Ms. Thompson's and Ms. Vasser's email inquiries about the status

of their Regional Manager applications); Pl.'s Ex. KK, ECF No. 40-3 (compiling human

resources documents for the Regional Manager position); Pl.'s Ex. LL, ECF No. 40-3

(reproducing the document pronouncing Ms. Vasser eligible for the Regional Manager position);

Pl.'s Ex. MM, ECF No. 40-3 (reproducing the document pronouncing Mr. Willis eligible for the

Regional Manager position).

Additionally, Ms. Vasser's discrimination allegations lack probative value in this case

because Ms. Vasser never applied for a position for which Mr. Luper was the selecting official.

*See* Pl.'s Ex. PP, ¶¶ 12, 17–60 (naming Mr. Batres as the "sole hiring authority for the regional

managers and . . . the approving authority for . . . deputy regional manager positions"). Evidence

of other institutional discrimination, like Ms. Vasser's allegations, has little meaning when "not

directly relevant to the type of disparate treatment about which plaintiff complains." *Davis v.*

*Joseph J. Magnolia, Inc.*, 815 F. Supp. 2d 270, 280 n.6 (D.D.C. 2011).

Ms. Thompson's allegations about her missing Regional Manager application similarly do not provide grounds on which a jury could infer intentional discrimination. She contends that both she and Ms. Vasser applied to be Region 1B's Regional Manager after Mr. Luper retired in July 2010. *See* Pl.'s Counter-Statement ¶¶ 71–75. But because Ms. Thompson never received confirmation of her application's receipt, *see id.* ¶¶ 77–78, and because the Regional Manager position stayed vacant for years afterward, *see id.* ¶ 85, Ms. Thompson implies that the VA handled the selection process improperly. *See id.* ¶¶ 78, 85. Yet Mr. Luper, being retired, was not the selecting official for the Regional Manager position, so this argument again has little probative value for Ms. Thompson's claims relating to her non-selection to be Deputy Regional Manager. *See Davis*, 815 F. Supp.2d at 280 n.6. It therefore does not aid Ms. Thompson in establishing evidence on which a jury could infer intentional discrimination.

The document that is most damning toward the VA is a redacted OIG report, which concludes that Mr. Batres "committed a prohibited personnel practice" when he provided one job applicant with "an advantage not afforded to any other applicant." Pl.'s Ex. A, ¶ 5, ECF No. 40-3. Ms. Thompson cites this report extensively when discussing Ms. Vasser's claims. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. 14–17. But the redacted OIG report does not mention Ms. Vasser by name. *See* Pl.'s Ex. A. And though it does mention a discrimination complaint filed against Mr. Batres, it expresses no view on the merits of that complaint. *See id.* ¶¶ 18, 60 (including "background information about the [discrimination] complaint against Dr. Batres because that allegation dealt with the same recruitment action").

Furthermore, even if the OIG report impugns Mr. Batres's credibility and personnel practices, the report has little relevance to Ms. Thompson's claims. Despite Ms. Thompson's claims to the contrary, *see* Pl.'s Statement ¶ 34, Mr. Batres was the approving official in

Ms. Thompson's case, not the selecting official. Thompson Decl. ¶ 68, ECF No. 34-8; *see also*

Pl.'s Ex. T, ¶ 11.a, ECF No. 40-3 (noting, in a paragraph under the heading "Selection," that

"[s]election may be made at a lower level [than the Chief of the Readjustment Counseling

Service] when authority is specifically delegated"); Luper Suppl. Decl. Ex. G, ECF No. 34-12

(showing that Mr. Batres was the approving official for Dale Willis's selection as Deputy

Regional Manager, over Ms. Thompson). Mr. Luper, not Mr. Batres, selected Mr. Willis over

Ms. Thompson. *See* Thompson Decl. ¶ 68. Ms. Thompson attempts to challenge Mr. Luper's

credibility by implying that Mr. Luper and Mr. Batres discussed Mr. Willis's selection, *see, e.g.*,

Pl.'s Statement ¶ 29, but the evidence on record shows that Mr. Luper and Mr. Batres discussed

the selection only after it was made. Luper Suppl. Decl. ¶ 25, ECF No. 34-11; Batres 2011 Dep.

46:15–48:1, ECF No. 34-6; Batres 2014 Dep. 51:11–22, ECF No. 34-7. The evidence

Ms. Thompson cites to the contrary merely states that Mr. Luper would "try" to call Mr. Batres

about the selection, *see* Pl.'s Ex. W, ECF No. 40-3; it does not show that the call actually

occurred or that they discussed the relative merits of the candidates. Thus, unrebutted evidence in

the record indicates that Mr. Batres's role in Mr. Willis's selection was limited to a discussion

that occurred after Mr. Luper chose Mr. Willis over Ms. Thompson, in which Mr. Batres assured

Mr. Luper that the VA could hold the position for Mr. Willis until he returned from his military

deployment. *See* Luper Suppl. Decl. ¶ 25; Batres 2011 Dep. 47:20–48:1. Given Mr. Batres's

limited role in the selection process as reflected in the record, the OIG report has too little

relevance to this case to allow a jury to infer intentional discrimination from its existence.[15]

---

[15] Ms. Thompson's deposition testimony posits another theory of discrimination deriving from improper conduct by Mr. Batres: she opines that Mr. Luper, in choosing a Deputy Regional Manager, might have declined to hire a black female because Mr. Batres had a policy against hiring black females in Regional Manager positions. Thompson Dep. 156:5–157:6, ECF No. 34-5. But because Ms. Thompson does not mention it in her opposition to summary

On the record presented, only Ms. Thompson's and Ms. Vasser's unsubstantiated allegations of discrimination support the idea that discriminatory hiring occurred throughout the Readjustment Counseling Service. *See, e.g.*, Pl.'s Opp'n Def.'s Mot. Summ. J. 23; Thompson Decl. ¶ 86, ECF No. 34-8 ("I believe there has been a pattern of discrimination when it comes to selecting black females for positions in the Regional Offices . . . ."); Def.'s Ex. 5, ECF No. 34-3 (reproducing Ms. Thompson's administrative complaint, which included a statement alleging that "African American females are under represented in the top positions in the Regional Office, Region 1B, and other Regional Offices . . . ."); Pl.'s Ex. PP, ¶¶ 61–66, ECF No. 40-3 (reproducing Ms. Vasser's federal-court complaint, which brought claims of race, sex, and age discrimination). But "bare allegations of discrimination are insufficient to defeat a properly supported motion for summary judgment." *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002). Without more evidence to support her claims of discrimination against herself and others, Ms. Thompson's arguments do not allow a reasonable jury to find that the VA intentionally discriminated against her on the basis of race, sex, or age. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

---

judgment, she has waived this line of argument. *See Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[U]ndeveloped arguments . . . are deemed waived."). Moreover, no other evidence in the record supports this theory, and Ms. Thompson's testimony appears to be based on hearsay. *See* Batres 2011 Dep. 61:20–66:17, ECF No. 34-6 (questioning Mr. Batres about multiple discrimination complaints impacting the Readjustment Counseling Service, but failing to bring to light any evidence of Mr. Batres's alleged discriminatory animus against all black females); Thompson Dep. 156:5–157:6 (showing that Ms. Thompson's hypothesis arose from information she received from a former Region 1B Regional Manager). Inadmissible hearsay "'counts for nothing' on summary judgment." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)).

3.  Circumstances Considered in the Aggregate

Ms. Thompson's arguments are no more persuasive when considered as a whole.

Although she contends that she has produced "overwhelming evidence" that undermines the

government's explanation for her non-selection and that "would permit a reasonable trier of fact

to infer discrimination," Ms. Thompson has shown neither that she was significantly more

qualified than Mr. Willis, nor that "other flaws" exist in the VA's explanation for Mr. Willis's

selection. *See supra* Part IV.B.1 (explaining why Ms. Thompson's qualifications were not

significantly better than Mr. Willis's); *supra* Part IV.B.2 (explaining why the other arguments

Ms. Thompson brings lack merit). *See generally Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284,

1294–95 (D.C. Cir. 1998) (en banc) (explaining that "[i]n cases involving a comparison of the

plaintiff's qualifications and those of the successful candidate," the plaintiff may avoid summary

judgment by showing that she was "significantly better qualified for the job," or by "expos[ing]

other flaws in the employer's explanation"). She likewise has not supported her claims of

systematic discrimination with "data showing that the [VA] employs members of the plaintiff's

protected class at rates far below their numbers in the applicant pool and the general population."

*Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006); *see supra* Part IV.B.2.e (explaining how

Ms. Thompson did not produce evidence of the number of African-American women occupying

the Readjustment Counseling Service's Regional Manager and Deputy Regional Manager

positions, of the number of African-American women in the applicant pool and the general

population, or of the statistical significance of any alleged underrepresentation).

In these circumstances, the Court must grant summary judgment to the government:

"This Court will not reexamine governmental promotion decisions where it appears the

Government was faced with a difficult decision between two qualified candidates, particularly

when there is no other evidence that race played a part in the decision." *Jackson v Gonzales*, 496

F.3d 703, 708 (D.C. Cir. 2007) (internal quotation marks omitted) (quoting *Stewart v. Ashcroft*,

352 F.2d 422, 430 (D.C. Cir. 2003)). The evidence in this case, even considered in the aggregate,

would not allow a jury to infer intentional discrimination against Ms. Thompson on the basis of

her race, sex, or age. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir.

2008).

## V.  CONCLUSION

Because no reasonable juror could find that Ms. Thompson suffered discrimination on the

basis of her race, sex, or age, the government is entitled to summary judgment on her Title VII

and ADEA claims. And because Ms. Thompson seeks voluntary dismissal of her retaliation

claims, the Court will dismiss those claims.

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 34) is

**GRANTED**. An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  March 14, 2016                                      RUDOLPH CONTRERAS
                                                           United States District Judge